Plaintiff, Opal Elmore, has filed this suit in which she seeks damages for personal injuries arising out of an automobile accident which occurred about one mile north of Laurel Hill on Highway 61 in West Feliciana Parish on May 31, 1946.
Plaintiff alleged that on the date of the accident she was a guest passenger in a Chevrolet automobile owned and operated by Royal J. Bryan when the automobile was involved in a collision with a truck or moving van belonging to Jackson Transfer 
Storage Company and being operated at the time of the accident by its agent or employee, Dante Donati; that the car owned and driven by Royal J. Bryan was also occupied by Donald Bryan, brother of Royal J. Bryan; that prior to and at the time of the accident it was traveling in a southerly direction on Highway 61; that the truck or moving van was traveling on said Highway 61 in a northerly direction; she further avers that the Bryan car was being driven at a reasonable and prudent rate of speed with due care under all the circumstances and being driven along its right hand side or west side of Highway 61, which is a black topped highway; that as the Bryan car approached a curve in the road, the moving van of defendant Jackson Transfer Storage Company came out of the curve headed in a northerly direction at an excessive rate of speed of more than 50 miles per hour, over and across the middle of the black topped highway; that it was raining heavily and visibility was poor; that the truck or van could not be seen until it came head on out of the curve and that it ran head on into the left front and left side of the Bryan car which resulted in driving the Bryan car off into a deep ditch along the west side of the highway, while the truck sheered off to its right and came to rest in the deep ditch on the eastern side of the highway; that the accident was caused by the gross negligence and recklessness of the driver of the large moving van in traveling at an excessive rate of speed, in failing to maintain a proper lookout, and in coming out of the curve of the road on his wrong side of the road.
Plaintiff itemized her damages for injuries, pain and suffering, expenses and loss of earnings, which totaled $23,070, and accordingly prayed for judgment in that amount in solido against the Jackson Transfer and Storage Company, a partnership, and against the individual members thereof, and against the American Fidelity and Casualty Co. Inc., liability insurance carrier of the other named defendants.
Defendants filed an exception of no cause or right of action which was referred to the merits. This exception was based upon a contention by defendants that plaintiff, by accepting $3,500 from the liability *Page 410 
insurer of Royal J. Bryan, which was the Aetna Casualty 
Surety Company, in full settlement of her claims against said insurer had received full compensation for her injuries. Clearly, this exception went to the merits of the case.
Defendants then filed an answer in which they denied that there was any negligence whatsoever on the part of the driver of the truck that in any manner contributed to the accident, and alleged that the accident resulted solely from the gross negligence and recklessness of Royal J. Bryan in entering the curve at a very high and dangerous speed on defendant's side of the road. Defendants further plead in the alternative that if there was any negligence on the part of the truck driver, Donati, then Royal J. Bryan was also negligent in that Opal Elmore was engaged in a joint venture with him, namely, that they were on their way to New Orleans to be married and that she exercised as much control over the car as he did. Defendants further plead in the alternative that if Opal Elmore, plaintiff herein, should be held to have been a guest passenger, she was guilty of independent negligence which contributed to the accident in not objecting to the way the car was being driven by her fiance, Royal J. Bryan, at the time of the accident, and, finally, defendants plead that the plaintiff, Opal Elmore, had heretofore collected $3,500 from the insurer of Royal J. Bryan's automobile as a result of her damages, and this amount so received by her compensates her in full for her damages and injuries.
The case was duly tried and the District Court rendered judgment with written reasons therefor in favor of the defendants and dismissed plaintiff's suit at her cost. The Lower Court concluded that: "Considering the testimony of Miss Elmore and of the truck driver Dante Donati, together with the physical facts as testified to by other witnesses, the conclusion is that plaintiff has failed to establish negligence on the part of the defendants' employee with legal certainty by a preponderance of the testimony and, therefore, judgment will be signed dismissing her suit at her cost."
Plaintiff has appealed from this adverse judgment.
The testimony discloses that plaintiff Opal Elmore left Monroe, Louisiana about noon on May 31, 1946 in a Chevrolet Sedan owned and being driven by her fiance, Royal J. Bryan, with their destination as New Orleans where they were to be married the next day. Also in the automobile with them was Donald Bryan, brother of Royal J. Bryan. It was raining when they left Monroe and continued to rain on their trip, and visibility was poor. The scene of the accident was approximately 140 miles from Monroe, north of St. Francisville on Highway 61, one mile north of Laurel Hill. The accident occurred at approximately 5:30 o'clock in the afternoon at or near the mouth of a curve in the highway.
The testimony shows that Dante Donati had been a licensed truck driver for eighteen years, and, on the date of the accident, was employed by the defendant Jackson Transfer and Storage. Company of Norfolk, Virginia, to drive defendant's 1946 Ford Trail Mobile model. This van and tractor had an over-all length of approximately forty-two feet, and a width of eight feel. The testimony further shows that he had spent the previous night a couple of miles below Natchez and had slept approximately eight hours; that he had left his sleeping place around 8 a.m. and had driven to Baton Rouge, Louisiana, and that about 2:30 or 3:00 o'clock p.m. he had left Baton Rouge headed for Memphis, Tennessee to reload for his return trip to Norfolk, Virginia; that when he left Baton Rouge on the afternoon of May 31, 1946, it was raining very hard and continuously and that he turned on the lights on the van and tractor and kept them on.
It appears from the record that there were three curves rather close together between Laurel Hill and the scene of the accident. The first curve was a left hand curve and the other two curves were right hand curves. The last curve, at which the accident occurred, was a rather abrupt curve as shown by the photographs filed in evidence. *Page 411 
It is shown that the only living eye witnesses to the accident were Opal Elmore, plaintiff, Donald Bryan, and the truck driver, Dante Donati. Royal J. Bryan, driver of the car, was killed in the accident. The Bryan brothers were residents of the State of Washington, and Donald Bryan did not testify in this case nor was his testimony taken by deposition, nor was any reason given for not obtaining his testimony.
Miss Opal Elmore, plaintiff herein, testified with regard to the accident on page 8 as follows:
"Q. Now, I would like you to describe for the Court, just in your own words, what happened, how the accident happened and what you saw of the accident? A. Well, I remember it was raining pretty hard that day and it was getting late in the afternoon, and we were just entering into this curve and all of a sudden this big truck appears, and it was just coming right towards us, and it was right in the middle of the road, and I remember screaming to look out for the big truck, and that is all I remember.
"Q. Which way was the truck moving — which way was it headed? A. It was coming right into us.
"Q. It was moving north and you were moving south, is that right? A. That is right.
"Q. Could you say whether or not Jack Bryan, driving the car you were in, was on his right side of the highway? A. Yes; we were on our side of the road.
"Q. Do you recall anything of the size of the truck that came toward you? A. Well, it was just a big narrow truck, it looked to me like it was the biggest thing I had ever seen because it was coming right into us.
"Q. You say that the truck was coming right at you in the middle of the road, do you mean to say that the truck was over its side of the middle of the road? A. Oh, definitely, it must have been.
Again on Page 20, she testified as follows:
"Q. You say there was nothing that the Bryan car could do to avoid this accident?
A. No, sir; because we didn't see the truck until he was coming around the curve and it was just instantly that it happened. We didn't see the truck until he was just coming around the curve and in just another second it was right upon us. He was just coming around the curve.
"Q. About how fast were you driving? A. I don't remember, but we weren't speeding. One thing, the road had slowed us down, we were talking about being late in getting to New Orleans."
Ersel Elmore, brother of the plaintiff, testified that he examined the scene of the accident the morning after and that from his examination that the visibility at the place of collision when traveling north, the direction in which the truck was being driven, was limited to 100 feet or less and that "proceeding south, previous to entering that curve, you entered about a 300 foot straight-away. This curve is rather abrupt at the south end of this straightaway and, as you approach the curve, it is impossible to see any distance around the curve." He further testified that, from an examination of the scene, the accident occurred at the north mouth of the curve, just as the Bryan car must have been entering the curve and just as the truck or moving van, going in a northerly direction, came out of the curve. It is established by the record that this is the point at which the collision occurred.
Ersel Elmore further testified that he observed six motor vehicles traveling north, and that five out of the six went over the center line in the south bound traffic lane in making this curve, but that, as a general rule, those traveling south remained on their side of the road; however, on this point Sheriff Martin testified that he had observed cars coming south into this curve and that some of them would use the inside of the curve and some of them would not. We believe that this is correct, and whether or not cars going north or south did cross out of their lane of traffic to make this curve would depend more or less upon the speed of each individual car. It does not seem reasonable that a car traveling at an excessive rate of speed could negotiate this curve without *Page 412 
using the inside or outside thereof, regardless of whether it was traveling north or south.
Roy Cash was placed upon the stand by the plaintiff and testified that he was a friend of the Elmore family and had visited the scene of the accident with Ersel Elmore. His testimony was of no value.
The defendants' testimony with regard to the accident consists in the main of the testimony of Dante Donati, the driver of the truck. Donati testified that the motor unit which he was driving was only four months old and had always been driven by him, and that it was in first class condition in every respect; that in view of the fact that it was a rainy day and visibility was bad, he had turned on his headlights and all other lights on the van and that they were on just prior to and at the time of the accident; that he had negotiated two curves prior to entering the third curve and that he was traveling at about 25 to 30 miles per hour; that as he came out of the curve in which the accident took place, he was traveling on the inside thereof and that the outside rear dual wheel was riding the shoulder of the black topped highway while the inside rear dual wheels on the right were on the black topped surface of the highway; that just before coming out of this curve he perceived the Bryan car coming down a hill from the opposite direction at a rapid rate of speed. He estimates the distance at which he first saw the Bryan car at approximately 500 feet, but he testifies that it was on its right side of the road at that time; that when the Bryan car got within approximately 100 feet of him, he noticed the car was skidding toward his side of the highway, and he realized then that the car was going to run into him; that on his right hand side of the highway there was a five foot ditch and that the shoulder was very soft; that he applied his hand brake on the van but that he could not use the pedal brake for the reason that this would have caused the van and tractor to have jack-knifed.
He testified that the Bryan car struck him on his left front fender and then continued on to the running board of the tractor, struck the gasoline tank in the rear of the tractor, and struck the van which protruded approximately fifteen inches beyond the sides of the tractor; that as a result of the collision his truck unit traveled approximately twelve feet after the impact and went into the ditch on his right side of the highway. It was shown that the damage done to the truck amounted to approximately $1,300. Donati testified that the Bryan Chevrolet traveled about twenty or thirty feet south and came to rest in the west ditch, facing north, the opposite direction from which it was traveling. Donati testified that he did not recall blowing his horn on negotiating the curve in question or just prior to the accident.
Deputy Sheriff Daniel of West Feliciana Parish testified that just a short time before the accident he passed the truck and, at that time, this truck was traveling in its right lane and at a reasonable rate of speed with its lights burning. Donati's testimony with regard to the positions of the two motor vehicles immediately after the accident is corroborated by Deputy Sheriff Daniel and also by Sheriff Martin of West Feliciana Parish.
Therefore, the evidence of the plaintiff and of the truck driver, Donati, the only two eye witnesses to testify in this case is wholly irreconcilable. The only physical facts in the case are the position of the two vehicles after the accident, the photographs which are in evidence showing the Bryan automobile to be practically demolished with the greater damage done to the left side of the car and the left front part of the top bent in, evidently where it struck the van of the truck. There was also testimony that on the right hand side of the road, about twelve or fifteen feet from where the truck went into the ditch, there were two gouges, however, no witness could say that these gouges were the result of the accident. The record shows that it was very difficult to dislodge the truck unit from the ditch, and it was entirely possible that these gouges could have been made when this was done. Therefore, these two gouges cannot be considered as tending to prove that the *Page 413 
accident occurred on the right hand side of the road going north. It is definitely established, however, that the left front fender of the truck had a long scratch in it which extended on down to the running board of the truck which was damaged, the gasoline tank was demolished, and the front left corner of the van damaged, as well as the chassis, and frame of the truck immediately under the dual wheel connection. The marks just described on the truck tend to prove that the Bryan car ran into the truck, first coming into contact with it on the left front fender.
Also in evidence are photographs taken by placing the camera 100 feet south of the point where the truck and Bryan automobile left Highway 61 after the collision, as well as photographs taken with the camera facing south, 100 feet north of where the truck and automobile left the road. The evidence fails to disclose at exactly what angle or place on the road the camera was located when these pictures were taken. It appears from these pictures, that each driver, when he got within 100 feet of the south of the curve, could see at least an additional 100 feet around the curve. In other words, Royal J. Bryan and Donati should have been able to have seen each other when they were two hundred feet apart.
Plaintiff, in briefs and in argument, contends that there should have been judgment in the Lower Court in favor of plaintiff, and that the judgment of the Lower Court should be reversed for the reason that Dante Donati, operator of the defendants' truck, committed three acts of negligence, each of which was a proximate cause of the accident, viz.:
(1) that he was over the center line of the highway on the wrong side of the road at the time of the accident;
(2) that he admitted that he was traversing hills, curves and defiles and that his vision was limited around this particular curve, and that he failed to sound his horn in warning signal of his approach, thereby violating one of the rules of the road as set forth in the Louisiana Highway Regulatory Act of 1938 as amended, (Dart's Louisiana Statutes Section 5221, Act No. 286 of 1938, § 3, Rule 16.); and
(3) that he was traveling at an excessive speed under the facts and circumstances in the present case and, because of that speed, he was unable to stop his truck or van or to bring it under control as he should have been able to do.
[1] As to plaintiff's first contention that defendant's truck was over the center line on plaintiff's side of the road at the time the collision occurred, there is nothing in the record to bear out this contention other than the testimony of the plaintiff, herself, and, from her version, the truck was right on top of them before she even saw it. We see no reason why she should not have seen this truck when it was approximately 200 feet away. Further, her testimony was that the truck must have been over on their side of the road. Opposing her testimony is that of the truck driver who states that he observed this car several hundred feet away but that it was only when it got within approximately 100 feet that it began to come over on his side of the road. It is certainly reasonable that this trained truck driver, with many years experience, upon seeing this car several hundred feet away would take every precaution to be on his side of the road. There was nothing to prevent him from being on his side of the road, as his speed was only twenty-five to thirty miles per hour.
Further, it is definitely established that the Bryan car ran into the truck and not the truck into the car. As to the position of the cars after the wreck, one might speculate that had the truck been over the center line, it would have remained more in the middle of the road rather than going off into the ditch; however, strange things happen in automobile collisions that are unexplainable. It is only those physical facts which, of themselves, without speculation, prove a positive fact that can be considered as positive evidence in a case. On the other hand, there is no doubt but that the Bryan car was traveling at an excessive rate of speed as testified to by Donati, the driver of the truck, by reason *Page 414 
of the fact that the Bryan car was practically demolished which is shown by the photographs. This certainly proves it was going at an excessive rate of speed when it struck the truck. The extent of damage done to the truck and van by the Bryan car, a part of which consisted of knocking the rear dual wheels on the tractor completely loose from the springs, is also evidence that the Bryan car struck the truck with great force, which is attributable to the excessive speed of the car.
From the testimony as to the nature of this curve and from the photographs of the curve itself introduced in evidence, which are very clear, there can be no doubt that a motor vehicle traveling at an excessive rate of speed going either north or south, would be unable to remain in its proper lane of traffic going around this curve. For these reasons, we are of the opinion that the truck of the defendants was not over the center line at the time of the accident.
On the other hand, we are convinced, from the testimony and physical facts as shown by the record, that the Bryan car was being operated at an excessive rate of speed and came over the center line of the highway and struck the truck of defendant.
[2] The second contention is that the defendant driver did not sound his horn as required by Rule 16 of the Louisiana Highway Regulatory Act of 1938 as amended. While Donati testified that he did not recall blowing his horn, it is evident from a consideration of his entire statement with regard to this phase of the case that he did not blow his horn. The testimony fails to show the length of the curve and, furthermore, the statute clearly provides that the horn shall be blown on entering the curve and there is nothing in the record to prove that the driver and other occupants of the Bryan car could have heard the horn of the truck had it been blown on entering the curve. The accident in this case happened just after the truck had completed the curve and just as the Bryan car was about to enter the curve, in other words, just at the mouth of the curve.
We do not think that the failure to blow the horn on entering the curve has been proven to be a proximate cause of the accident. Plaintiff relies on the case of Hollins v. Crawford, La. App., 11 So.2d 641, in support of her contention that failure to blow the horn was the proximate cause of the accident. In that case, the plaintiff was walking down the highway on the right side thereof and the defendant was traveling in his automobile, and, upon seeing plaintiff walking in front of him, pulled way over to the left side of the highway but did not sound his horn at any time. Just as the defendant got opposite the plaintiff, plaintiff became aware of the car and became frightened and lunged across the highway into the side of the car. The Court held that had the defendant sounded his horn as he should have done, even though the plaintiff was walking on the wrong side of the highway, plaintiff would have had time either to have gone completely across the highway to the proper side or to have gotten completely off the paved highway, and, in either event, the accident would not have occurred. The Court clearly held that the failure to blow the horn in that case was the proximate cause of the accident. In the present case, as stated, there is nothing in the record to prove that the occupants of the Bryan car could have heard the horn at any greater distance than they should have been able to have seen the truck, which had all of its lights on.
[3] The third contention of the plaintiff, and the most serious, is based on the theory that the truck unit's speed of 25 to 30 miles per hour on this wet, slippery, black topped road during a pouring rain was negligence per se because of the admission of the truck driver that he was afraid to apply his pedal brakes when he perceived the Bryan car at a distance of approximately 100 feet, skidding toward his side of the highway. The testimony shows that Donati, driver of the truck, saw the approaching car some four or five hundred feet away, but at that time it was traveling on its own proper side of the highway, and it was not until it had reached approximately 100 feet from the truck that it began skidding over the center line of *Page 415 
the highway in the truck's lane of traffic. Under these facts, the testimony was that the driver of the truck, immediately upon being confronted with this emergency, applied his hand brake on the van and attemped to pull over further to his right. He testified that from his experience under these facts and circumstances the safest method of stopping the truck or materially slowing it down was to do just what he did. He testified that should he have put on the pedal brake he thought that this would have caused the van to skid or jack-knife, which more than likely would have caused the truck to go off into the ditch on the right hand side and also would have so blocked the south lane of traffic to such an extent that the Bryan car, even if it had been able to remain on its proper side of the road, would have been forced to run into the van. Even if he had been able to bring the truck to a dead stop, there is nothing in the record to show with legal certainty that the accident would have been prevented, that is, that the Bryan car would not have still run into the truck.
The plaintiff also relies on the case of Redden v. Blythe et al., La. App., 12 So.2d 728, 731. In that case, plaintiff and defendant were traveling in opposite directions on the highway. According to defendant's version, which the appellate court accepted as being more correct than the plaintiff's version, when the two cars were five or six hundred feet apart, the defendant saw the plaintiff attempting to pass a truck traveling in the same direction as the plaintiff, and that while the defendant unconsciously retarded the speed of his car so that the automobile of the plaintiff could either pull ahead of the truck or drop behind and thus regain its proper side of the road, that defendant took no other precaution, and when the on-coming vehicle was a tittle over 100 feet from the defendant's car, he suddenly realized that the driver of the autombile was unaware of the presence of defendant's car and that an emergency had been created. The defendant then immediately slowed down and ran the right wheels of his car on the shoulder of the road but could not apply his brakes because the road way was wet and he feared that if he did he would skid over into the left hand side of the road into the truck, and that by pulling on to the shoulder of the road he did everything he could under the circumstances to prevent a collision.
The Court said: "In testifying with respect to the situation confronting him just prior to the accident, Blythe said that, when he first noticed the truck and the automobile approaching him, he was 500 or 600 feet away and that, while he unconsciously slowed down, he was not in a position to apply his brakes at the time he foresaw the possibility of an accident because the roadway was too wet. It seems to us that it was imprudent for him, while traveling on a wet road, not to have slowed down immediately to such a speed that he could have applied his brakes with safety. It will not do for him to say that he elected to wait until an emergency was created and that he could not apply all effective means at his command because it was too late. Caution demanded otherwise. His failure to act when he had time to act must be regarded as negligence which had causal connection with the ensuing accident."
In the case at bar, there was no reason for the driver of defendant's truck, when he first observed the Bryan car some several hundred feet away, to anticipate that the Bryan car was suddenly going to come over on his side of the highway. As soon as the Bryan car began to skid across the highway into the north bound traffic lane, the defendant driver in the present case acted immediately and did what he thought was best and safest for himself and the on-coming Bryan car.
Counsel for plaintiff, in a supplemental brief and in oral argument cites the case of Daw v. Matthews, La. App.,34 So.2d 666, 668. In that case the Court said, in part: "Accepting plaintiff's version of the facts of the accident, he saw the other truck coming toward him, over the road's center in ample time to stop his own vehicle or to have pulled it several feet to the right and into a zone of safety until the impending danger had passed. Obviously, on this theory of the accident, *Page 416 
he had the last clear chance to avert it and failed to avail himself of the opportunity then open to him."
In the case at bar, while it is true that Donati saw the Bryan vehicle approaching some five hundred feet away, it was only when it reached a point approximately 100 feet away that it began to skid across the center line of the highway. The testimony shows that the outside right rear dual wheel on the tractor of the truck was over on the shoulder of the road. The evidence does not reveal the width of the shoulder on Donati's side of the highway but does reveal that the shoulder was soft as a result of the heavy rains, and that there was a deep ditch along side of the highway at this point. Furthermore, Donati acted wisely and to the best interest of himself and the Bryan car by putting on the van brake rather than attempting to come to a dead stop. It is, therefore, not shown by the record in this case that Donati could have safely stopped his own vehicle or pulled it any further to the right without endangering himself and the occupants of the on-coming Bryan car, or that had he been able to bring the truck to a dead stop that the accident would have been prevented.
For the reasons above stated, it is, therefore, ordered that the judgment of the District Court be affirmed, the plaintiff to pay all costs. *Page 624